USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/29/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

LAWRENCE MARTIN, et al.

                                           Plaintiffs,                         15-CV-8137 (AJN)(SN)

                 -against-                           **OPINION & ORDER**

COINMACH CORPORATION,

                                          Defendant.

-----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge:**

      On October 15, 2015, Lawrence Martin and five additional plaintiffs ("Plaintiffs") brought an action against defendant Coinmach Corporation pursuant to Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000 *et seq.*; the Civil Rights Act of 1871, 42 U.S.C. § 1981; and the New York City Human Rights Law ("NYCHRL"), § 8-107(a) of the Administrative Code of the City of New York. Complaint, ECF No. 1. Plaintiffs, African-American service technicians employed by Coinmach, claimed that they were intentionally discriminated against in their pay rates and excluded from consideration from promotion on account of their race. After partially completing the discovery process, Plaintiffs seek leave to amend their complaint to add disparate impact claims under Title VII and the NYCHRL. The Plaintiffs' motion is GRANTED IN PART.

**BACKGROUND**

      Plaintiffs are African-American service technicians who work for Coinmach and repair and maintain the washers and dryers that Coinmach provides to its customers. Compl. ¶¶ 26–27. Plaintiffs allege that during the entire course of their employment, Coinmach has systematically

underpaid its African-American service technicians as compared to similarly situated white employees. Id. ¶ 31. Plaintiffs identify several policy mechanisms through which this came to be. First, they point to a subjective, standardless merit raise system in which full discretion was granted to David Tulkop, Area Vice President for Coinmach from 1988 to October 2012. Id. ¶ 33. Plaintiffs requested and were denied merit raises from Mr. Tulkop. Id. ¶ 36. Second, in or around 2010, Coinmach instituted an "All-Star Rewards" incentive program that purported to use objective, service-related criteria to provide bonuses for service technicians, but that plaintiffs allege operated in an unfair manner prejudicial to African-Americans because it failed to take into account the designs or locations of the employees or other relevant variables. Id. at ¶¶ 34–36. Third, plaintiffs contend that Coinmach's policy of acquiring other companies and retaining service technicians at the rate of pay that they were receiving at their previous employer exacerbated the pay differential between white and African-American employees. Proposed Amended Complaint ("PAC"), ECF No. 30-1 ¶ 41.

Plaintiffs also allege that they were subject to discrimination in their ability to apply for promotions. Until 2013, open supervisory positions in their department were not posted, and Coinmach permitted managers to make promotions on a wholly subjective basis. PAC ¶ 44. Plaintiffs claim that between 1989 and 2013, Mr. Tulkop granted promotions to only one African-American, while granting promotions to seven white and two Asian employees with less seniority than most of the plaintiffs. PAC ¶ 48.

All six plaintiffs filed charges alleging race discrimination with the Equal Employment Opportunity Commission ("EEOC") between March 2013 and April 2014. Compl. ¶¶ 12–20; ECF No. 31-1. The complaints were, in general, broadly worded and noted both individual and workplace-wide pay discrepancies between African-Americans and whites and lack of

opportunities for promotion for African-Americans. See ECF No. 31-1 at 17, Howell Charge (alleging that "I was a supervisor and due to non-support from my employer I was forced to step down and return to non-supervisory position" and that white employees had retained their supervisory salaries in similar circumstances); Id. at 19, Killburn Charge (alleging that Killburn personally and other African-Americans generally were paid less than whites despite similar seniority); Id. at 22, Champagne Charge (alleging that Champagne personally and other African-Americans generally were passed over for promotions and wage increases); Id. at 24, Innocent Charge (same language as Champagne charge); Id. at 26, Pierre Charge (alleging specific instance of being passed over for wage increase and promotion, racial wage disparities regardless of seniority, and hostile work environment).

The charge brought by plaintiff Lawrence Martin was preceded by a detailed "explanations for intake questionnaire" statement dated January 2, 2013. ECF No. 31-1 at 4. In this questionnaire, Martin put the EEOC on notice of a number of personal incidents with Mr. Tolkup, but also of his allegations that African-Americans were systematically hired at lower pay rates than whites, that there was no prospect for advancement in the company for minority employees, and that the All Star Rewards program has been applied in an unaccountable and subjective fashion. Id. at 6–7.

The EEOC issued identically worded determinations for Lawrence Martin, Jean Innocent, Jean Pierre, Amis Kilburn, and Alix Champagne on February 26, 2015. ECF No. 31-2 at 1–11. The EEOC determined "that there is reasonable cause to believe that Respondent discriminated against Charging Party and a class of similarly situated Black service technicians due to race in connection with wages. Our review of wages for Black and White service technicians with similar start dates, as well as less senior White service technicians, showed evidence of disparate

pay in favor of the White service technicians." Id. On March 31, 2015, the EEOC issued a subsequent decision for Anthony Howell with similar conclusions. Id. at 12–13. On July 16, 2015, the EEOC concluded that its efforts to conciliate the charges had failed and issued a Notice of Right to Sue to each plaintiff. Compl. ¶ 22. In light of the failure of conciliation, plaintiffs timely brought this action on October 15, 2015.

The original complaint pled only disparate treatment based on the allegedly discriminatory decisions of Mr. Tolkup. The amended complaint seeks to plead in the alternative that Coinmach's policy of granting "merit" raises at the discretion of supervisors is a facially neutral practice that has a disparate impact on African-American employees. PAC ¶ 34. Plaintiffs allege that this practice, coupled with the collective bargaining agreement's percentage-based increase, additional bonuses provided through the similarly discretionary All-Star Rewards Program, and Coinmach's practice of acquiring other companies and retaining service technicians at the same rate of pay are components of a single policy that leads to this disparate impact. Id. at ¶ 42. They further allege that the practice of not posting open supervisory positions and the lack of objective criteria for promotions to such positions was a facially neutral practice with a disparate impact on promotion of black technicians. Id. at ¶ 43–44.

## DISCUSSION

**I.     Legal Standard**

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that courts should "freely give leave [to amend a complaint] when justice so requires." "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'" Williams v. Citigroup Inc., 659 F.3d 208, 212–13 (2d Cir. 2011) (citing New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005)). Leave to amend may, however, be denied if the amendment is

futile. See, e.g., Knife Rights, Inc. v. Vance, 802 F.3d 377, 389 (2d Cir. 2015). Amendment is futile if the "amended portion of the complaint would fail to state a cause of action." Parker v. Columbia Pictures Indus., 204 F.3d 326, 339 (2d Cir. 2000); see also Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 244 (2d Cir. 2007) (amended complaint must be "sufficient to withstand a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6)"). Under this standard, the proposed amendment "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The party opposing amendment has the burden of establishing that amendment would be futile or otherwise inappropriate. Allison v. Clos-ette Too, L.L.C., No. 14-CV-1618 (LAK)(JCF), 2015 WL 136102, at *2 (S.D.N.Y. Jan. 9, 2015).

## II.   Exhaustion of Administrative Remedies

Coinmach argues that granting plaintiffs leave to amend their complaint to add Title VII disparate impact claims is futile because plaintiffs did not allege disparate impact in their EEOC charges, and their charges were not "reasonably related" to such claims. It is uncontested that in order to raise their claims in federal court, plaintiffs must first have filed a complaint before the EEOC. Burgis v. New York City Dep't of Sanitation, 798 F.3d 63, 71 (2d Cir. 2015). The claims brought in federal court need not be identical, but must be "reasonably related to the allegations in the complaint filed with the EEOC . . . ." Kirkland v. Buffalo Bd. of Ed., 622 F.2d 1066, 1068 (2d Cir. 1980). A claim is "reasonably related" when "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003). This standard has been described as "loose pleading," given that EEOC charges frequently are filled out by

employees without the benefit of counsel, and that their primary purpose is to put the EEOC on notice of the discrimination that employees are suffering. Butts v. City of N.Y. Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1402 (2d Cir. 1993)

Coinmach reads the EEOC charges to raise complaints of disparate treatment only, and it argues that they fail to place the EEOC on notice that a facially neutral employment policy may have been generating a disparate impact on African-American employees. Plaintiffs were not, however, required to plead disparate impact in their EEOC complaints with the specificity required in a federal court action. Instead, whether claims are reasonably related depends "on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003) (citation omitted); see also Alonzo v. Chase Manhattan Bank, N.A., 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998) (("[I]t is the substance of the charge and not its label that controls.").

While the EEOC charges are generally non-specific as to whether a specific facially neutral policy is producing the discriminatory effect that plaintiffs complain of, they plainly allege widespread disparities in pay rates between similarly situated white and black employees as opposed to isolated instances of intentionally discriminatory treatment and/or retaliation. See Kilburn Charge, ECF No. 31-1 at 19 (noting both discrimination against himself personally and the fact that "other black service technicians are similarly paid less than their white counterparts, despite having worked for Respondent for as long as or longer than their white counterparts"); Pierre Charge, Id. at 26 ("All of the Black Technicians/Servicemen are paid at a lower rate than their white counterparts regardless of seniority. . . . Respondent continues to treat its Black employees in a disparate fashion and continues to follow the discriminatory practice of excluding Black employees from advancement."); Champagne Charge, Id. at 22 ("All black employees

6

with Respondent are paid less than non-black employees and none have ever been promoted.");
Innocent Charge, Id. at 24 (same). Moreover, Lawrence Martin's detailed "explanations for intake questionnaire" specifically reference the implementation of the "All-Star Rewards Incentive Program" in addition to unfettered supervisory discretion as the policies that are contributing to the racially disparate outcomes of which plaintiffs complain. Id. at 6–7.

Moreover, interview notes from the EEOC's investigator demonstrate that the scope of the EEOC's investigation—which led to a finding that there was reasonable cause to believe that Coinmach violated Title VII—were not limited to charges of disparate treatment. Indeed, it appears that, in the course of its investigation, the EEOC actually examined each of the facially neutral policies that plaintiffs claim contributed to a racially disparate impact throughout the course of its investigation, with the sole exception being Coinmach's practice of maintaining the salary levels of new employees incorporated from newly-acquired companies. ECF No. 33-1 at 6 (discussing collective bargaining agreement, standards for merit increases, posting (or lack thereof) of open supervisory positions, and All-Star Rewards Service Incentive Program).

The cases cited by Coinmach in support of its lack of exhaustion argument are distinguishable. In Burgis, two plaintiffs brought EEOC charges, complaining only of adverse employment action taken against themselves and failing to allege any widespread or systemic discrimination in the workforce as a whole. 798 F.3d at 71. By contrast, in this case all plaintiffs made clear that they were challenging policies that affected all black technicians in their workplace, even as they also alleged specific instances of discrimination against them as individuals. Similarly, in Woodman v. WWOR-TV, Inc., 293 F. Supp. 2d 381, 389–90 (S.D.N.Y. 2003), plaintiff complained of a discriminatory termination tainted by an improper consideration of her age in violation of the Age Discrimination in Employment Act ("ADEA"). Unlike here,

where the EEOC investigated practices that were plausibly facially neutral, such as allegedly standardless merit raise policies and incentive programs and failure to post supervisor positions, the only issue in that case was whether age was impermissibly used to make employment decisions. Id. at 390. Finally, in Mathirampuzha v. Potter, 548 F.3d 70, 72 (2d Cir. 2008), a plaintiff complained to the EEOC of a single instance of physical assault at the workplace, which was found not to be an adverse employment action as a matter of law. His broader Title VII claims alleging hostile work environment stemming back several years and retaliation were deemed to be unexhausted, as the EEOC was not reasonably put on notice of such claims. Id. at 76.

Accordingly, the Court finds that the plaintiffs properly exhausted their administrative remedies with respect to a potential disparate impact claim and are not barred from amending their complaint on this ground.[1]

## III. Futility

Coinmach further argues that plaintiffs' claims could not survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and that leave to amend should be denied for futility.

"To make out a prima facie disparate impact case, a plaintiff [ ] must '(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two.'" Barrett v. Forest Laboratories, Inc., 39 F. Supp. 3d 407, 428 (S.D.N.Y. 2014) (quoting Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 151 (2d Cir.

---

[1] Coinmach also argues that plaintiffs' claim under the NYCHRL is barred by the three-year statute of limitations. Their argument hinges on the claim that plaintiffs did not properly file a claim alleging disparate impact with the EEOC. Because the Court deems that the plaintiffs provided sufficient facts in their EEOC charges to put the agency on notice of potential disparate impact claims, it finds that the statute of limitations should be equitably tolled during the pendency of those charges.

2012)). A plaintiff need not "plead facts sufficient to establish a prima facie case" in his complaint in order to survive a motion to dismiss. Jenkins v. New York City Transit Authority, 646 F. Supp. 2d 464, 469 (S.D.N.Y. 2009). But the plaintiff should identify a "facially neutral" policy or practice — that is, a policy or practice that applies equally to individuals regardless of their race, color, religion, sex, or national origin, and was "adopted without discriminatory intent," Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 990 (1988) — that, in fact, causes a disparate impact on a protected class.

### A. Pay Discrimination

In their proposed amended complaint, Plaintiffs identify four specific policies that they allege, taken together, cause a disparate impact: (1) a subjective and standardless merit increase policy; (2) a similarly subjective and standardless All-Star Rewards Incentive Program; (3) a CBA that provides percentage-based increases that allegedly exacerbate disparities produced by the merit increase policy; and (4) the practice of acquiring new service technicians at their existing rate of pay. Plaintiffs argue that these four elements form part of a cohesive decision-making process that can be analyzed as "one employment practice," as the elements "are not capable of separation for analysis." Port Auth. Police Asian Jade Soc. v. Port Auth. of N.Y. & New Jersey ("Jade Society"), 681 F. Supp. 2d 456, 464 (S.D.N.Y. 2010) (citing 42 U.S.C. § 2000e–2(k)(1)(B)(i)).

The Court agrees with Coinmach that plaintiffs' claims are capable of separation for analysis. In the Jade Society case cited by plaintiffs, the court found that "because the role of each step [in a multi-step promotion process] cannot be determined, the steps cannot be examined separately to discover whether a particular step causes a disparate impact." Id. No such considerations exist in this case. The merit increase policy, the All-Star program, and

Coinmach's practices with regards to employees incorporated through acquisition agreements are three wholly independent policies, and there is no plausible reason why the racially disparate effects of each could not be individually analyzed. Indeed, it is difficult to fathom how they could be considered together in an intelligible fashion. Accordingly, the Court will consider each of the claims individually.

### i. The Collective Bargaining Agreement

The plaintiffs' claim that the provisions of the CBA have a racially disparate impact on Coinmach's workplace appear to be premised on the fact that the agreement does not prevent the employer from granting merit increases, and that the negotiated yearly wage increases exacerbate the disparities generated by the other three policies.

Standing alone, none of the provisions of the CBA could have a plausible disparate impact on the workplace. To the extent that the yearly increases of the CBA exacerbate the effect of any disparate impact or disparate treatment suffered by plaintiffs, such increases do not generate the disparity itself, they only contribute to the quantum of damages suffered by plaintiffs. In the event that plaintiffs ultimately prove their case and establish Coinmach's liability under Title VII, such issues will be addressed in the determination of damages. Accordingly, plaintiffs shall not amend the complaint to include complaints related to the CBA.

### ii. Merit Increase Policy

The crux of plaintiffs' disparate impact claim is that Coinmach periodically grants technicians "merit" raises, though it has "at no relevant time herein communicated to its employees or consistently applied any objective criteria by which a Service Technician could seek and obtain a merit increase in his hourly wage." PAC ¶ 34. According to plaintiffs, this

facially neutral practice of permitting merit increases upon a supervisor's sole discretion was applied in discriminatory fashion by Mr. Tulkop from 1988 to 2012. PAC ¶¶ 34–35.

The Supreme Court has held that "disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests. In either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices." Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 990 (1988). Accordingly, "'in appropriate cases,' giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—because 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 355 (2011) (quoting Watson, 487 U.S. at 990–91)).[2] The Dukes Court emphasized, however, that Watson's holding was conditioned "on the corollary that merely proving that the discretionary system has produced a racial or sexual disparity *is not enough.* '[T]he plaintiff must begin by identifying the specific employment practice that is challenged.'" Id. (quoting Watson, 487 U.S. at 994).

On this standard, Coinmach alleges that Mr. Tolkup's subjective decision-making is not a "specific employment practice" that can be challenged in a disparate impact claim, and that any violations of Title VII stemming from his conduct sound only in disparate treatment. Therefore, according to Coinmach, "the facially neutral employment practice that [plaintiffs] invoke as the premise for disparate impact liability coalesces with the [adverse employment actions] which

---

[2] The Supreme Court's decision in Wal-Mart Stores Inc. v. Dukes held only that such a claim could not serve as a basis for certifying a nationwide Rule 23 class because "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's" and the commonality requirement for class certification would not be met. Dukes, 564 U.S. at 355–56. It did not cast doubt on the vitality of Watson's central holding that subjective practices could be challenged in a disparate impact claim.

[they] claim to have constituted disparate treatment." Maresco v. Evans Chemetics, 964 F.2d 106, 115 (2d Cir. 1992).

The Court disagrees. Drawing all inferences in the plaintiffs' favor, the company's policy of making all merit increases dependent entirely on the discretion of a white supervisor, in the absence of any objective criteria to cabin or direct that individual's judgment is a "specific employment practice," as the term is used in Watson.[3] It is not relevant that Plaintiffs also allege that Mr. Tolkup did in fact engage in such intentional discrimination, as long as they can conceivably establish a prima facie case that Coinmach's merit raise policy lead to a statistically significant disparate impact even in the absence of intentional discrimination. See Wright v. Stern, 450 F. Supp. 2d. 335, 369 (S.D.N.Y. 2006) ("There is nothing inconsistent in acting with intent to discriminate while adopting a facially neutral policy that has a disparate impact; the two are not mutually exclusive."). Any inconsistency between the two theories is simply pleading in the alternative.

Several courts in this District have concluded that plaintiffs have stated a disparate impact on similar facts. In Gordon v. City of New York, No. 14-CV-6115 (JPO)(JCF), 2016 WL 4618969 (S.D.N.Y. Sept. 2, 2016), the court granted a motion to amend a complaint adding disparate impact claims in the context of promotions where managers used "unidentified criteria" in addition to a numerical evaluation score, non-diverse managers were in charge of making promotion recommendations, and there was a lack of blind review of low-level promotional recommendations by final decision makers. Id. at *3. The Gordon court rejected the defendant's

---

[3] Indeed, albeit in the promotion context, this factual scenario is not dissimilar from that in Watson itself, which involved a mid-size employer that "had not developed precise and formal criteria for evaluating candidates for [promotion]" and "relied instead on the subjective judgment of [white] supervisors who were acquainted with the candidates and with the nature of the jobs to be filled." Watson, 487 U.S. at 982.

12

arguments that the "disparate impact allegations are merely disparate treatment allegations in fancy dress," and found that "the disparate effects of the [defendant's] employment procedures could easily be caused by, for example, 'subconscious stereotypes and prejudices' . . . ." Id. at *6 (citing Watson, 487 U.S. at 90). In Wright v. Stern, 450 F. Supp. 2d 335 (S.D.N.Y. 2006) (Chin, J.), the court denied defendant's motion for summary judgment on disparate impact claims alleging that defendant "did not regularly post available positions," "failed to examine the validity of its interview process," and "did not have any policies regarding when interviews should be conducted . . . ." Id. at 368–69. Noting that these were all facially neutral policies, the court concluded that such policies could have a disparate impact on the class of African-American and Hispanic plaintiffs. Id. at 369.

Coinmach cites several cases from outside this District that appear to hold otherwise, but these cases are distinguishable. In Welch v. Eli Lilly & Co., No. 06-CV-0641, 2009 WL 2461119 (S.D. Ind. Aug. 11, 2009), the court denied a motion to amend a complaint to add disparate impact claims because plaintiffs sought to challenge over a dozen different types of subjective decisions stemming from their employer's evaluation program. Such a complaint was deemed to be insufficiently specific to meet the Watson standard. Id. at *6. In contrast, plaintiffs here have identified a policy pertaining to only one issue: merit raises. In Brown v. Wyndham Hotel Mgmt. Inc., No. 16-CV-0015, 2016 WL 2595073 (S.D. Tex. May 5, 2016), the court denied a similar motion when the plaintiff complained that defendant "engaged in a process and/or practice of aggressively evaluating and disciplining former employees that resulted in disparate impact on the basis of age." Id. at *2.

While plaintiffs' complaint is not a model of specificity, it does state affirmatively and with greater detail that Coinmach has neither enunciated nor applied any objective criteria in its

13

merit increase policy, and that Mr. Tulkop never provided any explanation for why he granted or denied a raise. PAC ¶¶ 34, 36. Taking plaintiffs' allegations as true for the purpose of this motion, according local management full discretion unbound by objective standards to decide on merit raises is an "employment policy" of greater specificity than the allegedly "aggressive" evaluation and discipline process complained of in Brown.

To be sure, because plaintiffs have not presented statistics to support their claim, they have not proven a prima facie case that the policies that they have identified have produced a disparate impact. In order to survive a motion to dismiss, however, plaintiffs need not provide statistical support for their claims—"an allegation on information and belief that a neutral employment practice denied equal employment opportunities to a small number of members of a protected class compared to similarly-situated colleagues suffices." Gordon, 2016 WL 4618969, at *7 (citing Barrett, 39 F. Supp. 3d at 436). Plaintiffs have identified numerous similarly-situated white service technicians who have been paid more than plaintiffs over time, allegedly as a result of Coinmach's merit raise policy, and therefore have pled sufficient facts to make their disparate impact claim plausible.

Accordingly, plaintiffs' claim that Coinmach's allegedly standardless merit increase policy had a disparate impact on a protected group is not futile, and plaintiffs may amend their complaint to include this claim.

### iii. All-Star Rewards Incentive Program

Plaintiffs contend that the All-Star Rewards Incentive Program for Service Technicians, instituted in 2010, operates in an "unfair manner because it failed to take into account the designs or locations of the Service Technicians' ability to perform repairs and other assignments in any given week." PAC ¶¶ 37–38. Plaintiffs complain that they, as well as black employees in

general, fared worse than white employees under the program. Id. at ¶ 39. Coinmach argues that, as the Program is a monthly bonus incentive program that offers money in addition to employees' wages and does not become a component of those wages, plaintiffs have no claim that the program contributed to racially disparate compensation patterns within the enterprise.

The Court disagrees that the fact that the All-Star program does not become incorporated into the hourly wage rate implies that it cannot have a disparate impact on a protected group; at any rate, factual arguments about the nature of the program are "more appropriate to a summary judgment motion than a motion to amend in which the allegations in the complaint are to be taken as true." Gordon, 2016 WL 4618969, at *6. The plaintiffs' claims regarding the program, however, fail to "infer more than the mere possibility of misconduct," and therefore fail to state a claim. Iqbal, 556 U.S. at 679. Whereas their merit increase claim is buttressed by claims that plaintiffs had asked for and been refused merit raises, as well as claims that similarly-situated white employees received higher rates of pay, with a plausible causal mechanism between the two, in regards to the All-Star program plaintiffs merely allege that the program was defectively administered and that there were complaints that black employees fared worse under it. Indeed, plaintiffs fail to allege any specific facts about black employees' performance in the program, or identify any causal mechanism between the neutral variables used by the program and any alleged disparities in compensation that resulted from their application.

Accordingly, plaintiffs have not stated a claim that the All-Star program has produced a disparate impact and may not amend the complaint to include this claim.

    **iv.**    **Employees Incorporated through Acquisition Agreements**

Plaintiffs' final claim is that Coinmach has "maintained a pattern or practice by which, when acquiring another company and thereby hiring new service technicians, [the company]

agrees to pay those service technicians the same rate of pay they received from the company being acquired." PAC ¶ 41.

This allegation does not support a plausible disparate impact claim. Even when drawing all inferences in their favor, Plaintiffs have not adequately alleged that the acquisition of new employees from other companies led to white employees being incorporated at higher wage rates than their African-American counterparts. Accordingly, Plaintiffs may not amend their complaint to include this claim.

### B.      Promotion Discrimination

Plaintiffs also allege that they were "systematically denied the opportunity to even apply for promotions because until 2013, open supervisory positions in their department were not posted and defendant permitted its managerial employees to make promotion decisions on a wholly subjective basis." PAC ¶ 44. They further claim that on multiple instances, less-experienced and less-qualified white employees were promoted to supervisor, and that on certain occasions some plaintiffs had to train such employees. Id. at ¶ 45. As a result of these practices, plaintiffs claim, seven white and two Asian technicians with less seniority than most of the plaintiffs were promoted to supervisor, with only one black supervisor being hired after the filing of the EEOC charge. Id. at ¶¶ 48–49. Coinmach claims that Plaintiffs' allegations are conclusory, and that, at any rate, the subsequent, individual decisions about who to approach for promotions, not the failure to post open positions, would have been responsible for any resulting disparity. Furthermore, Coinmach argues that because failures to promote are typically considered "discrete acts," they are also not subject to the continuing violations doctrine under Title VII. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002); see also Bermudez v. City of New York, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011) ("The standard for applying the

continuing-violation doctrine to claims under the NYCHRL and the NYSHRL is also governed by Morgan.").

Drawing all inferences in plaintiffs' favor and accepting all allegations in the complaint as true, the Court finds that plaintiffs have adequately pled a disparate impact claim in regards to Coinmach's facially neutral policy of failing to post open supervisor positions. Coinmach is correct, however, that the "continuing violation doctrine" does not apply to these failure to promote claims. The Court of Appeals has explicitly held that the logic of Morgan applies to disparate impact claims based on a failure to promote. Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 156–57 (2d Cir. 2012) ("Morgan's reasoning . . . demonstrates that a plaintiff may recover for a failure to promote—regardless of whether it was caused by an ongoing discriminatory policy—only if he files an EEOC charge within [the applicable statutory limitations period]."). This is necessarily so because every "use" of an employment practice that causes a disparate impact has been deemed to be a separate actionable violation of Title VII with its own statute of limitations clock. Id. at 158 (citing Lewis v. City of Chicago, 560 U.S. 205 (2010)). Coinmach is also correct that the Lily Ledbetter Fair Pay Act of 2009 applies only to "compensation decisions and not other employment decisions such as hirings, firings, promotions, and demotions." Davis v. Bombardier Transp. Holdings (USA) Inc., 794 F.3d 266, 270 (2d Cir. 2015).

As such, plaintiffs may amend their complaint to include a disparate impact claim pertaining to promotions. But because such claims are not eligible for inclusion within the "continuing violation" doctrine, plaintiffs may only file such claims occurring within the relevant statute of limitations period.

## IV.	Relation Back

An amended complaint relates back to the date of the original complaint if it arises out of the same conduct, transaction, or occurrence as the original complaint. Fed. R. Civ. P. 15(c)(2). Because the plaintiffs' disparate impact claims arise from substantially the same series of facts as their disparate treatment claims, the amended complaint shall be deemed to relate back to the filing of the original complaint on October 15, 2015.

## CONCLUSION

Plaintiffs' motion for leave to file an amended complaint is GRANTED IN PART. By December 5, 2016, Plaintiffs may file an amended complaint including a disparate impact claim for pay discrimination based on Coinmach's merit increase policy, and a disparate impact claim for promotion discrimination based on Coinmach's policy of failing to post open supervisory positions, insofar as such claims are not time-barred. Plaintiffs may not include claims pertaining to the CBA, Coinmach's acquisition agreements and the All-Star Rewards Incentive Program, as these sections of their Proposed Amended Complaint fail to state a claim and are thus futile.

The Court requests that the Clerk of Court terminate the motion at ECF No. 28.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:	New York, New York
	November 29, 2016